## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| STARNET INSURANCE COMPANY, a Delaware corporation, and BERKLEY UNDERWRITING PARTNERS, LLC, a Delaware limited liability company, | **FIRST AMENDED COMPLAINT OF STARNET INSURANCE COMPANY AND  BERKLEY UNDERWRITING PARTNERS, LLC AGAINST THORSON & ASSOCIATES INSURANCE SERVICES, INC.FOR BREACH OF CONTRACT AND EXPRESS INDEMNITY** |
| Plaintiffs, | |
| v. | |
| THORSON & ASSOCIATES INSURANCE SERVICES, INC., a California corporation, | Civil Action No. 1:08-cv-2174 |
| Defendant. | Judge Guzman (Mag. Judge Mason) |

Plaintiffs allege as follows:

### JURISDICTION AND VENUE

1.      Plaintiff, StarNet Insurance Company ("StarNet") is a Delaware corporation, with its principal place of business in Greenwich, Connecticut.

2.      Plaintiff, Berkley Underwriting Partners, LLC ("Berkley" or "Company") is a Delaware limited liability company with its principal place of business in Naperville, Illinois.

3.      Defendant, Thorson & Associates Insurance Services, Inc. ("Thorson") is a corporation incorporated in California with its principal place of business in California.

4.      This court has original jurisdiction under 28 U.S.C. § 1332, in that there is complete diversity between the parties and the matter in controversy exceeds $75,000, exclusive of interest and costs.

5.      Venue is proper in this Court pursuant to a valid forum selection clause in the contract which is the subject of this action, as set forth in paragraph 6 below.

## FACTUAL BACKGROUND

6.    On October 1, 2004, Berkley Underwriting Partners LLC (the "Company"), as Manager for StarNet, entered into a "Program Administrator Agreement" ("PAA") with Thorson, whereby Thorson was appointed as Program Administrator to solicit, underwrite, bind and issue StarNet insurance policies as set forth in the PAA.  A true and correct copy of the PAA (including Exhibits A-D thereto) is attached as Exhibit 1 and is incorporated herein by reference.

7.     StarNet is an express third party beneficiary of the PAA.

8.    Section 10.6 of the PAA provides that any dispute arising out of the PAA shall be submitted and litigated in Chicago, Illinois, and that Thorson as Administrator under the PAA submits to the jurisdiction of the United States District Court for the Northern District of Illinois, Eastern Division.

9.    Section 8.2 of the PAA provides *inter alia* that Thorson as Administrator agrees to defend, indemnify and hold Berkley harmless from any loss from negligent or willful errors or omissions of Thorson as Administrator under the PAA, which loss includes all costs, expenses and reasonable attorneys fees, and that these provisions shall survive termination of the PAA.

10.    Section I of the PAA entitled APPOINTMENT/AUTHORITY provides that Thorson's authority is limited and governed, *inter alia,* by "Exhibit A Underwriting Authority" attached to the PAA.  Sec. "G. Forms" of Exhibit A to the PAA provides in pertinent part:

>    Administrator shall **only use the policy forms and endorsements approved by the Company** and filed with the respective Insurance Department(s) . . . . (emphasis added).

11.    Section I of the PAA also provides in relevant part as follows:

>    1.2    Subject to the limitations contained in this Agreement,

Administrator shall perform all acts necessary to the proper

solicitation, placement, acceptance, and servicing of the

policies including:

a.      to solicit, underwrite, quote, bind, rate, code, and

store policies; and

b.      to collect, receive, and account for premiums on

policies; and

c.      to number, issue, countersign, and deliver policies

executed by authorized officers of Company . . . .

12.     Section III of the PAA entitled LIMITATION OF AUTHORITY, provides in

relevant part:

3.1     With respect to the policies which Administrator is now or

may in the future be authorized to solicit, transact, quote,

underwrite, rate, or bind under this Agreement,

**Administrator will not solicit, transact, quote,**

**underwrite, rate, or bind policies on . . . b.  risks which**

**are not in compliance with the applicable forms, rules,**

**rates, or filings of Company according to their exact**

**terms** and to the laws and regulations in effect in the

Territory.  (emphasis added).

13.     The "forms, rules, rates, or filings of the Company" as to StarNet policies under

the above PAA Sec. III. 3.1.b. include the **Declarations**, page 2, regarding premium which reads:

**"TOTAL PREMIUM (Subject to Audit)."**

3

14. The "forms, rules, rates, or filings of the Company" for the StarNet policies under the above PAA Sec. III. 3.1.b. pertinent here also include the "**Premium Schedule**," which specifically provides for an entry under "**Advance Premium**."

15. The "forms, rules, rates, or filings of the Company" for the StarNet policies under the above PAA Sec. III. 3.1.b. pertinent here also include, a **"Premium Audit" Clause**, appearing as Section 5, on page 12 of 16 of the ISA Commercial General Liability Coverage form CG 00 01 10 01 as follows:

    **5.**    **Premium Audit**

        a.    We will compute all premiums for this Coverage Part in accordance with our rules and rates.

        b.    Premium shown in this Coverage Part as **advance premium is a deposit premium only**. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. **The due date for audit and retrospective premiums is the date shown as the due date on the bill.** If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

        c.    The first Named Insured must keep records of the information we need for premium computation and send us copies at such times as we may request.

(emphasis added).

16.     Section V of the PAA entitled PREMIUM REPORTING AND CASH REMITTANCES under Section 5.3 provides that Thorson as Administrator will provide company with an itemized monthly Statement of transactions under the PAA, including premiums written and quoted, and premiums collected.

17.     Thorson as Administrator was authorized by Berkley to quote a premium to an applicant or insured only based upon the applicant's estimated annual payroll, and only subject to adjustment retroactively to reflect actual payroll, as determined by annual audit of the insured's payroll.

18.     Section V entitled PREMIUM REPORTING AND CASH REMITTANCES of the PAA, under Section 5.1 provides that Thorson as Administrator "shall be liable for and shall pay to Company (Berkley) all net written premium attributable to the policies produced hereunder, whether or not such premiums have been collected by Administrator."

## FIRST CLAIM FOR RELIEF

### (Breach of Contract - Audits)

19.     Plaintiffs incorporate paragraphs 1-18 as though fully set forth herein.

20.     Berkley has satisfied all of its obligations to Thorson under the PAA.

21.     Thorson breached the PAA by failing to comply with the foregoing limitations on its authority to quote premium for policies it issued by representing to certain companies (referred to collectively as "the Unaudited Companies") that the premium Thorson quoted would *not* be subject to retroactive adjustment after audit.

22.     The Unaudited Companies included Red Carpet USA, LLC.  Copies of the Declaration Pages, Premium Schedule and Premium Audit Clause in the StarNet policy Thorson

5

issued to that company are attached as Exhibit 2.  A copy of Thorson's letter to Red Carpet USA, LLC stating that the StarNet policy was "nonauditable" is attached as Exhibit 3.

23.     The Unaudited Companies included Golden Bear Marketing & Transportation, Inc.  Copies of the Declaration Pages, Premium Schedule and Premium Audit Clause in the StarNet policy Thorson issued to that company are attached as Exhibit 4.  A copy of Thorson's Premium Summary dated December 16, 2005, to Golden Bear Marketing & Transportation stating that the general liability policy "will not be audited" is attached as Exhibit 5.

24.     The Unaudited Companies included G&M Oil Company, Inc.  Copies of the Declaration Pages, Premium Schedule and Premium Audit Clause in the StarNet policy Thorson issued to that company are attached as Exhibit 6.  A copy of Thorson's Premium Summary dated November 30, 2004, to G&M Oil Company, Inc. stating that the "General Liability will not be subject to audit" is attached as Exhibit 7.

25.     The Unaudited Companies included Palm Springs Oil Company, Inc.  Copies of the Declaration Pages, Premium Schedule and Premium Audit Clause in the StarNet policy Thorson issued to that company are attached as Exhibit 8.  A copy of Thorson's Premium Summary dated December 16, 2005, to Palm Springs Oil Company, Inc. stating that the "GL [general liability] will not be subject to audit" is attached as Exhibit 9.

26.     The Unaudited Companies included Winall Oil Company.  Copies of the Declaration Pages, Premium Schedule and Premium Audit Clause in the StarNet policy Thorson issued to that company are attached as Exhibit 10.  A copy of Thorson's letter to Winall Oil Company stating that the StarNet policy was "nonauditable" is attached as Exhibit 11.

27.     Plaintiffs are informed and believe, and thereon allege, that total premium due and owing from the Unaudited Companies after audit of their payroll would have been more than

6

$75,000 greater than the premiums quoted and collected by Thorson without such audit.

28.     As a proximate result of Thorson's breach of the PAA Plaintiffs have been damaged in an amount to be proved at trial, in excess of $75,000.00.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract – Payment of Premiums)

29.     Plaintiffs incorporate paragraphs 1-18 as though fully set forth herein.

30.     Berkley has satisfied all of its obligations to Thorson under the PAA.

31.     Thorson breached the PAA by failing to comply with Section 5.1 of the PAA which provides that Thorson as Administrator "shall be liable for and shall pay to Company (Berkley) all net written premium attributable to the policies produced hereunder, whether or not such premiums have been collected by Administrator."

32.     Thorson issued StarNet insurance policies pursuant to the PAA to insureds, premiums for which have not been paid to StarNet.

33.     As a proximate result of Thorson's breach of Section 5.1 of the PAA plaintiffs have been damaged in an amount to be proved at trial, in excess of $600,000.00.

## THIRD CLAIM FOR RELIEF

### (Express Indemnity)

34.     Plaintiffs incorporate paragraphs 1-28 as though fully set forth herein.

35.     On October 1, 2004, Berkley, as Manager for StarNet, entered into a PAA with Thorson, whereby Thorson was appointed as Program Administrator to solicit, underwrite, bind and issue StarNet insurance policies as set forth in the PAA.

36.     StarNet is the express third party beneficiary of the PAA.

37.     Berkley has satisfied all of its obligations to Thorson under the PAA.

3019z.doc

38.    Thorson expressly agreed in the PAA to defend, indemnify and hold Berkley

harmless from any loss from negligent or willful errors or omissions of Thorson as Administrator

under the PAA.

39.    Section 8.2 of the PAA provides:

At all times hereafter, Administrator agrees to defend, indemnify,

and hold Company harmless from and against all claims, actions,

causes of action, liability, or loss which result from any real or

alleged negligent or willful acts, errors, or omissions of

Administrator, or the servants, employees, representatives,

producers, or brokers of Administrator in the performance or

breach of duties under this Agreement, including but not limited to

soliciting, quoting, underwriting, and/or binding policies prohibited

under Section 3.1.  Administrator further agrees that in the event

Company is in violation of any state code, statute, regulation, or

bulletin due to the negligent or willful acts, errors, or omissions of

Administrator, or the servants, employees, representatives or

producers of Administrator, then Administrator shall assume the

responsibility and liability for such act and shall indemnify and

hold Company harmless for such liability and loss.  Loss shall

include, but not be limited to, all damages, costs, expenses,

reasonable attorneys' fees and other legal fees, penalties, fines,

direct or consequential damages, assessments, verdicts (including

punitive damages to the extent permissible by law), and any other

8

expense or expenditure incurred by Company.

This Section 8.2 shall survive termination of this Agreement.

40.    Thorson breached the PAA by failing to comply with the foregoing limitations on its authority to quote premium for policies it issued by representing to the Unaudited Companies that the premium Thorson quoted would not be subject to retroactive adjustment after audit.  The Unaudited Companies included Red Carpet USA, LLC, Golden Bear Marketing & Transportation, Inc., G&M Oil Company, Inc., Palm Springs Oil Company, Inc., and Winall Oil Company.

41.    Plaintiffs are informed and believe, and thereon allege, that total premium due and owing from the Unaudited Companies after audit of their payroll would have been more than $75,000 greater than the premiums quoted and collected by Thorson without such audit.

42.    By reason of the foregoing, Plaintiffs are expressly entitled to be held harmless and indemnified by Thorson for all loss resulting from Thorson's negligent acts, errors, and omissions in an amount to be proved at trial, in excess of $75,000 and for costs and reasonable attorney fees incurred in this action.

### PRAYER

WHEREFORE, Plaintiffs pray for judgment against Thorson as follows:

1.    For all damages resulting from the first claim for relief for breach of contract – audits, according to proof;

2.    For all damages resulting from the second claim for relief – payment of premiums, according to proof;

3.    For all damages resulting from the third claim for relief for express indemnity, according to proof;

9

4.      For Plaintiffs' costs of suit and reasonable attorney fees incurred herein; and

5.      For general relief.

FORAN GLENNON PALANDECH & PONZI PC


By:___s/Matthew S. Ponzi_____
            Matthew S. Ponzi
            Garrett Kern
            150 South Wacker Dr., Suite 1100
            Chicago, IL 60606
            Telephone:  (312) 863-5000
            Facsimile:  (312) 863-5099
            E-Mail:      mponzi@fgpp.com

            Attorneys for Plaintiffs,
            STARNET INSURANCE COMPANY and
            BERKLEY UNDERWRITING PARTNERS, LLC


CHARLSTON, REVICH & WOLLITZ LLP


By:___s/Howard Wollitz_____
            Howard Wollitz [CA SBN 58674] [Pro Hac Vice]
            1925 Century Park East, Suite 1250
            Los Angeles, California 90067
            Telephone:  (310) 551-7000
            Facsimile:  (310) 203-9321
            E-Mail:      hwollitz@crwllp.com

            Attorneys for Plaintiffs,
            STARNET INSURANCE COMPANY and
            BERKLEY UNDERWRITING PARTNERS, LLC

3019z.doc

STARNET INSURANCE COMPANY, et al. v. THORSON &
ASSOCIATES INSURANCESERVICES, INC.

Civil Action No. 1:08-cv-2174

EXHIBITS 1-11

TO

FIRST AMENDED COMPLAINT OF STARNET INSURANCE
COMPANY AND  BERKLEY UNDERWRITING PARTNERS, LLC
AGAINST THORSON & ASSOCIATES INSURANCE SERVICES,
INC.FOR BREACH OF CONTRACT AND EXPRESS INDEMNITY

**EXHIBIT 1**

# PROGRAM ADMINISTRATOR AGREEMENT

This Program Administrator Agreement (the "Agreement") is effective this October 1, 2004 (the "Effective Date"), by and between Berkley Underwriting Partners LLC (the "Company") and Thorson and Associates Insurance Services, Inc. (the "Administrator").

WHEREAS, StarNet Insurance Company is a licensed, and/or authorized, insurance company in various states of the United States; and

WHEREAS, Company is deemed as the Manager of StarNet Insurance Company and therefore has express and implied authority to enter into this contract and perform such duties as required by this contract; and

WHEREAS, Administrator has substantial expertise in soliciting, developing, marketing, underwriting, and issuing contracts of insurance for certain coverages as described herein which uniquely meet the insurance needs of certain persons and entities; and

WHEREAS, Company desires to appoint Administrator to solicit, underwrite, bind, and issue such insurance coverages; and

NOW, THEREFORE, for good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## I.    APPOINTMENT/AUTHORITY

Subject to the limitations contained in this Agreement, Company hereby appoints Administrator as its Program Administrator for the purpose of underwriting, issuance, and delivery of policies or contracts of insurance and endorsements thereto as described in Exhibit A Underwriting Authority, attached hereto and incorporated by this reference, and any memoranda provided to Administrator from time to time, (individually a "policy" or collectively, the "policies"). Exhibit A may be modified by Company from time to time without the need to amend this Agreement and shall be effective upon five (5) days written notice to Administrator. Additionally, Company may, from time to time, provide Administrator with revised underwriting guidelines, procedures, instructions or memoranda setting out certain policies of Company with regard to the coverage or Policies written by Administrator which shall govern Administrator's conduct including, but not limited to, permitted coverage, character and quality of risk, reporting, policies issued, renewals, cancellations, collections or remittance of premiums and premium refunds, accounting, and record keeping. Administrator agrees to comply with and be bound by such revisions immediately without the need for amendment of this Agreement.

1.2    Subject to the limitations contained in this Agreement, Administrator shall perform all acts necessary to the proper solicitation, placement, acceptance, and servicing of the policies including:

   a.    to solicit, underwrite, quote, bind, rate, code, and store policies; and

   b.    to collect, receive, and account for premiums on policies; and

   c.    to number, issue, countersign, and deliver policies executed by authorized officers of Company; and

    d.      to make endorsements, changes, and modifications to policies as authorized by Company; and

    e.      to effect cancellation and non-renewal of policies.  Such cancellation and non-renewal authority shall not, during the Term of this Agreement, be construed as authority to make general or indiscriminate cancellation, non-renewal, or replacement of the policies with those of another company, except upon specific written instructions from the Company or after notice to Administrator from Company; and

    f.      to accept submissions from producers; however, Administrator shall have no authority to process appointments or terminations of appointments with state insurance departments on behalf of Company, unless Administrator receives prior written approval of Company; and

    g.      to perform faithfully the duties set forth herein and to provide any other related activities or services incidental or necessary to the complete servicing of policies issued hereunder.

1.3     All policies shall have an effective date on or after 12:01 a.m. P.S.T. on October 1, 2004.

1.4     Unless Administrator receives prior written approval of Company to communicate directly with an insurance department, communication and correspondence with the various insurance departments relating to rate and form filings will be solely through Company.  The parties will work together to promptly and adequately respond to any such correspondence.  The Administrator shall not waive any condition or make any change to the Company's insurance policies, endorsements, or applications without the prior written consent of the Company.

1.5     Nothing contained herein shall create the relationship of employer and employee between Company and Administrator or between Administrator and any other representative of Company.  Except as set forth herein, Company shall have no right of control over Administrator as to the time, means, or manner of Administrator's performance of its duties hereunder.  Administrator shall conduct itself and its business under the terms of this Agreement solely as an independent contractor.

1.6     Administrator shall not employ jointly an individual who is employed by the Company.

1.7     Both Administrator and Company are aware that there are or may be laws or regulations in the various jurisdictions served by Administrator that may be interpreted to provide Administrator with certain rights of notice, "run-off", continuation of business written through Administrator, prevention of termination and regulatory review and possible disapproval of the termination of this Agreement.  Because this Agreement has been mutually entered into for a special purpose, and places responsibilities, duties and obligations upon Administrator both beyond those and different from those of a normal soliciting producer, Administrator acknowledges that this, therefore, involves and necessitates a different relationship.  Administrator hereby specifically waives any and all rights with respect to termination of this Agreement that may now and hereafter be provided Administrator by such statute or regulation in recognition of that different relationship, and agrees not to impose upon or require compliance by Company of any obligations relating to termination of this Agreement other than those provided for specifically in this Agreement.

## II.   TERM OF AGREEMENT

This Agreement begins on October 1, 2004, and will continue until terminated under the provisions of Section IX (hereinafter referred to as the "Term").

## III.   LIMITATIONS OF AUTHORITY

3.1    With respect to the policies which Administrator is now or may in the future be authorized to solicit, transact, quote, underwrite, rate, or bind under this Agreement, Administrator will not solicit, transact, quote, underwrite, rate, or bind policies on the following:

   a.    risks which are unacceptable in accordance with this Agreement, or the underwriting guidelines, procedures, instructions, or memoranda provided to Administrator by Company from time to time, or in excess of the authority limits, or in violation of any other limitations set out in Exhibit A; or

   b.    risks which are not in compliance with the applicable forms, rules, rates, or filings of Company according to their exact terms and to the laws and regulations in effect in the Territory.

The introduction and any revisions to this Agreement or to the underwriting guidelines, procedures, instructions, memoranda, forms, rules, rates or filings will be effective only upon written notice to the Administrator by the Company.

3.2    In the event that Administrator solicits, transacts, quotes, underwrites, rates, or binds policies as prohibited by Section 3.1 above without the prior written approval of Company, whether intentional or not, Administrator will immediately do such things and take such actions as are necessary to remove or to minimize Company's exposure as an insurer on such unacceptable risks or such excess policy limits. Further, Administrator shall indemnify and hold the Company harmless for any and all payments that the Company may be required to make under policies which are prohibited by Section 3.1.

3.3    Administrator shall have no authority to arrange, purchase, or enter into any negotiations or agreements on behalf of Company to obtain reinsurance of any type with respect to the policies written by or through Administrator, shall have no authority to bind retrocessions on behalf of Company, and shall have no authority to commit Company to participate in insurance or reinsurance syndicates.

3.4    Administrator shall not act as an insurer for any insureds, and this Agreement shall not be construed as an insurance policy or any contract or agreement of indemnity of insureds.

3.5    Administrator may not offset any balance due from Company to Administrator against any amounts due from Administrator to Company under this Agreement, or under any other contract with Company or any other party.

3.6    Administrator shall not collect payment from a reinsurer or commit Company to a claim settlement with a reinsurer.

3.7    With regard to business which is the subject matter of this Agreement, Administrator shall not, without prior written consent from Company, quote or bind any policy written by any insurer other than Company, to a potential insured to whom it has or may quote or bind a policy written by Company. Administrator further agrees that it will not, without prior written consent from Company, quote or bind any policy except a policy written by the

Company for any insured when the expiring policy of the insured was written by the Company. For any business which is the subject matter of this Agreement, Administrator further agrees that in regard to any risk, that seeks insurance through Administrator, it will submit information on such risk to Company prior to submission to any other insurer.

IV.    **GENERAL OBLIGATIONS OF ADMINISTRATOR**

4.1    Administrator represents and warrants that:

    a.    Administrator is fully licensed, qualified and authorized to act as insurance agency and producer, to perform its respective obligations hereunder, and is duly incorporated and in good standing under the laws of the States in which it does business, and Administrator will maintain such licenses, qualifications and/or authorizations for the period the Administrator is acting on behalf of the Company; and

    b.    Administrator has obtained all corporate authorizations as may be necessary to enable Administrator to enter and perform such commitments and obligations as it has hereunder; and

    c.    the full performance of any obligation hereunder by Administrator shall not constitute a breach or violation of any agreement and shall not be subject to any agreement limiting the full performance hereof, other than as contemplated herein.

4.2    Administrator shall maintain a listing and current copies of the insurance licenses of any sub-producer, or broker from which Administrator accepts a submission. Administrator shall supervise all producers who place business through Administrator. Further, Administrator shall be responsible to Company for such producers and for all funds, whether or not collected, for business solicited by such producers. At Company's request, Administrator shall allow Company to review, or provide copies to Company of the listing of and of any agreements with sub-producers. Administrator shall not permit its sub-producer or employed broker to serve on the Company's Board of Directors.

4.3    Administrator shall be responsible for full compliance with all applicable laws, regulations, rules, and requirements relating to the performance of its obligations hereunder; and the general standards, rules, and regulations of the insurance industry; and all written instructions provided to Administrator from time to time by Company.

4.4    On request, Administrator will forward to Company no later than five (5) days from such request exact copies of any policies or other appropriate evidences of insurance written, modified, or canceled pursuant to this Agreement; underwriting and financial documents or other reports written, produced, or received hereunder; policyholder data; or any other information in Administrator's possession requested by Company relating to the policies.

4.5    Administrator shall keep true and complete records of all transactions and correspondence with policyholders, producers, sub-producers, brokers, state insurance departments, reinsurers, and Company.

4.6    All records and documents required to be maintained by Administrator referred to herein including, but not limited to, policyholder information, underwriting files, financial documents, and records relating to Administrator's Premium Trust Account, shall be maintained during the Term of this Agreement and thereafter while providing any continuing services hereunder, in a manner and form as mutually agreed upon or as required by

TA - PAA

Company to be compatible with Company's internal procedures and in accordance with generally accepted accounting principles and insurance regulatory practices. Such records shall be maintained for a period of no less than five (5) years (or such longer period as Company may request) after termination of this Agreement, and in such manner and form as may be required by Company's record retention guidelines. At the end of such five (5) year period, Administrator shall provide Company with originals, copies or electronic copies of such records.

4.7    During the Term hereof, and notwithstanding termination hereof, such records and documents may be audited, examined, and copied by representatives of Company at any time, or its authorized representatives, during normal business hours and shall be made available for examination by Company, reinsurers, or any state insurance department or regulatory body which so requires.

4.8    Administrator shall provide Company with a monthly written report in the format prescribed by Company of all declaration(s) or policy(ies) spoiled, voided, or mutilated inadvertently hereunder. Administrator further agrees to return any such spoiled, voided, or mutilated declaration(s) or policy(ies) to Company with such report.

4.9    With regard to the policies written, Administrator shall provide, at its expense sufficient information to satisfy reporting requirements imposed on Company by boards, bureaus, and associations, including statistical reporting entities, and to enable Company and reinsurers to file required financial statements and reports with State Insurance Departments and regulatory bodies. Administrator will provide all required information no later than three (3) business days prior to the mandated filing date. Company shall provide Administrator with such written and/or electronic reporting requirements. Furthermore, Administrator is responsible for all development cost of any and all extracts needed in connection with the Company's data systems. With the agreement of Administrator, Company may choose to authorize Administrator to act on its behalf in providing such information to, and/or corresponding with, any such requesting entity as described herein.

4.10    Administrator shall notify the Company within five (5) days of notice or receipt (or such shorter period as necessary to adequately respond) of any complaint with any state insurance department or other regulatory authority relating to the policies, whether against Company, Administrator, producers or brokers. Administrator shall provide Company with a proposed written response to a complaint and a copy of all documentation relating to such complaint including, but not limited to, a written summary of all facts relevant to such complaint. Company will then respond, or authorize Administrator to respond, to such complaint in such form as Company determines, in Company's sole discretion, necessary. The parties will work together to promptly and adequately respond to any such complaint in accordance with applicable insurance department requirements. If the Company so chooses, it may authorize Administrator to respond, directly to the insurance department, to any and all complaints received by the Administrator without the prior notification to Company or adherence to the procedures previously described in this Section. If such an authorization is granted, Administrator agrees to provide Company with a copy of each response at the same time Administrator's response is sent to the insurance department. Further, Administrator agrees to cooperate with Company in all such matters related to Section 4.10.

4.11    Except as specifically provided herein, Administrator shall have no authority to delegate any authority contained herein to brokers, producers, sub-producers, or to any other person or entity without the prior written authorization from Company.

4.12    Since Administrator and its employees are independent contractors and not employees of Company, all Administrator expenses including, but not limited to, Administrator's office rent; transportation; salaries; utilities; furniture; fixtures; equipment; telephone; attorney or other legal fees; postage; promotional advertising and public relations expenses; preparation and printing costs of proposals, premium notices, records, policy forms, endorsements, applications, and all other documents necessary for the performance of Administrator's obligations hereunder; reports; retail credit reports and any other documents required to fulfill the obligations of Administrator under this Agreement; commissions, fees, or countersignature fees due to producers, or brokers; and Administrator's license fees and occupational taxes, whether billed to Administrator or Company, shall be the sole liability of Administrator, unless assumption of such expense by Company is agreed to in writing by Company. Administrator will remit promptly to Company the amount of any such item billed to Company upon notice by Company to Administrator of the charge therefore.

4.13    Administrator shall not charge or commit Company to any expense, agreement, payment, debt, settlement, or obligation other than as expressly provided for herein.

4.14    Administrator may not use the name, logo, or service mark of Company or any of its affiliates in any advertising, promotional material, including electronic media, or in any material disseminated by Administrator without the prior written consent of Company. Administrator shall maintain copies and provide an original to Company of any advertisement or other materials approved by Company along with full details concerning where, when, and how it was used. Administrator shall be liable for any liability of or cost incurred by Company as a result of any such materials.

4.15    All supplies, including those containing Company name or logo, provided to Administrator or authorized to be used by Administrator by Company shall remain the property of Company and shall be returned immediately upon request. Upon termination of this Agreement or Administrator's authority hereunder, at Company's request, Administrator shall return all, or such property as Company may request, to Company or to its designated representative.

4.16    Administrator shall notify Company in writing:

    a.    fifteen (15) days prior to any change of ownership of ten percent (10%) or more of the outstanding stock of Administrator; or

    b.    fifteen (15) days prior to any change in control of Administrator or the owner of a controlling interest in Administrator not related to the transfer of shares of Administrator; or

    c.    within thirty (30) days of any change of any principal officer of Administrator.

4.17    If Company provides Administrator access to Company information or networks through computer access, Administrator shall be responsible for maintaining the security and integrity of such information and of Company's systems. Additionally, Administrator shall be responsible to ensure that Administrator's employees and representatives are aware of the sensitive and proprietary nature of the information obtained, of the importance of confidentiality, and of the conditions described in this Section 4.17.

4.18    Administrator agrees to furnish Company with a balance sheet, profit and loss statement and cash flow statement annually (or more often as requested by Company's Financial Officer). The statements will accurately reflect the financial condition of the Administrator, and the financial statements will include an auditor's statement and report if Administrator obtains

TA - PAA

audited statements. The audited financial statements shall be furnished to Company within one hundred and twenty (120) days following the close of the fiscal year of Administrator, or sooner if available.

If Administrator does not obtain audited statements, the financial information furnished may be unaudited, unless submission of an audited statement is required by the law of any state having jurisdiction over this Agreement. Such unaudited financial statements shall be furnished to Company within ninety (90) days following the close of the fiscal year of Administrator or at any time as reasonably requested by the Company. If Administrator does not obtain audited financial statements, Administrator shall provide its most recently filed federal income tax return in addition to the unaudited financial statements.

## V.    PREMIUM REPORTING AND CASH REMITTANCES

5.1    Administrator shall be liable for and shall pay to Company all net written premium attributable to the policies produced hereunder, whether or not such premiums have been collected by Administrator. "Net written premium" as used herein and hereunder is defined as gross written premium of Company for the classes of business hereunder, less cancellations and return premiums and less commissions as defined in Article VI.

5.2    All sums collected by the Administrator on behalf of the Company are received in a fiduciary capacity and may be deposited into Administrator's general trust account before directly deposited into a Premium Trust Account. The Premium Trust Account must be with a non-affiliated bank approved by Company's Financial Officer. No funds that the Administrator receives on behalf of any other entity are to be deposited into the Premium Trust Account, unless specifically approved by Company's Financial Officer. Administrator agrees to furnish the Company with such information as the Company may require from time to time, including, but not limited to, the amount on deposit on behalf of the Company in any such account at any time, a list of checks drawn on any account involving the Company containing the names of the payee and the amounts and any other information requested by the Company.

The Premium Trust Account may be an interest-bearing account in a non-affiliated bank approved by Company in writing which meets the "Premium Trust Account Guidelines," a copy of which is set forth in Exhibit B attached hereto and incorporated herein by this reference and as modified from time to time by Company without the need for amending this Agreement, with interest payable to Administrator until such amounts are due to Company as set forth below.

Company shall have the absolute and unfettered right at all times to obtain information and statements from the bank regarding the Premium Trust Account. If this Agreement is terminated, Company shall have the right to appoint a substitute trustee for the Premium Trust Account or to direct the Bank to pay amounts in the Premium Trust Account to the Company or others.

Upon the issuance of a notice of termination of this Agreement, with or without cause, the Administrator's authority to make distributions from the Premium Trust Account shall be suspended. Thereafter, Administrator may withdraw moneys from the Premium Trust Account only with the express written consent of the Company.

Administrator shall be responsible for full compliance with all applicable laws, regulations, rules, and requirements regarding the Premium Trust Fund(s).

TA - PAA

The keeping of an account with Administrator on Company's books, as a creditor or debtor account, is declared a record memorandum of the policies transacted; and the keeping of such account, an alteration in commission rate, a failure to endorse remittances promptly, or compromise, settlement, or declaration of the balance of the account shall not waive Company's right to assert the fiduciary nature of the premiums collected by Administrator.

5.3    Administrator shall provide Company with an itemized statement (the "Statement[s]") of money due to Company within three (3) days from the end of the month. Such Statement shall include the names of all insureds, the applicable policy effective date, the applicable policy expiration date, the transaction effective date for each policy or endorsement issued, the type of policy, the state or states where the risk(s) is located, gross written premium amount, net written premium amount, premiums collected, Administrator's fee, if any, and such other information and in such format as Company may request from time to time. Administrator shall remit amounts based on net premium written for the month less Administrator's fee on net written premium, as reported in such statement to Company within forty-five (45) days from the last day of the month from which coverage is effective. Any dispute respecting such Statement(s) shall be resolved based on Company's records.

5.4    Administrator shall use diligence in collecting premiums from insureds.

5.5    Notwithstanding termination of this Agreement, Administrator shall refund to the policyholder or insured, as appropriate, or to Company if so directed by Company in writing, return premiums, at the same rate as provided in the applicable policy and commissions on return premiums at the same rate paid to Administrator.

5.6    Should Administrator default in any payment of premiums referred to herein, the entire collected portion of unpaid premiums on the policies shall be due and payable immediately.

5.7    If appropriate, Administrator agrees to be responsible for the collection and payment of any applicable surplus lines taxes and the filing of all affidavits as required by the appropriate surplus lines governmental entities and jurisdictions and shall provide Company with written evidence of such payment and compliance at any time as is reasonably requested by the Company.

5.8    The Company agrees to pay all federal, state and municipal taxes, licenses required by law, and fees or assessments of underwriting associations or pools of which the Company is required to be a member. Administrator shall be responsible for the collection of such funds, which by law are due from the insured, and payment to the Company via the remittance procedures described in Section 5.3 of this Agreement. Any such amounts not collected from the insured or paid to the Company, for which the Company is responsible for payment to regulatory authorities, shall be reimbursed by the Administrator to the Company.

## VI.    COMPENSATION OF ADMINISTRATOR

6.1    Subject to Administrator's compliance with the terms and conditions of this Agreement, Company shall pay Administrator a commission on gross premiums less cancellation and return premiums for all policies written and received pursuant to the Commission Schedule attached hereto as Exhibit C and incorporated herein by this reference.

6.2    The commission paid hereunder shall be full compensation for all services rendered by Administrator pursuant to this Agreement.

TA - PAA                Page 8 of 23

## VII.  GENERAL OBLIGATIONS OF COMPANY

7.1    Company shall cooperate with Administrator to appoint Administrator, any of Administrator's personnel and any of Administrator's producers or brokers, if so required and at the request of the Administrator, in the Territory in which Administrator shall be soliciting and underwriting on behalf of Company.  The Administrator shall bear the cost of all appointments.

7.2    Subject to the applicable laws and regulations of the Territory, and notwithstanding Section 1.2 (e) of this Agreement, Company shall have the right to modify, cancel, or refuse to renew any business written hereunder and same may be effected by Company requesting Administrator to modify any policy/certificate, or give notice of cancellation or non-renewal to the policyholder/certificate holder.  Alternatively, or should Administrator not act within a reasonable time, Company may send such notice directly to the policyholder/certificate holder, in accordance with applicable law(s).

7.3    Company shall have the sole right to respond to any state insurance department complaint or inquiry, after consulting with Administrator as provided herein.

7.4    Company agrees that it shall not use Administrator's name, logo, or service mark in connection with any advertising without Administrator's prior written approval.

7.5    Company may combine or offset any balances or funds owed by Administrator to Company against any balances or funds owed to Administrator by Company under this Agreement or any other agreement between the parties.

7.6    Upon Administrator's written request, Company shall provide records and documentation relating to loss data to the Administrator which contains the following information:  Named Insured, policy number, effective date, expiration date, loss date, report date, state, claim number, status, loss description, paid expenses, gross losses paid, gross loss adjustment expenses, deductible, reserves, and claim value.  During the Term hereof, and notwithstanding termination hereof, such records and documents may be audited, examined, and copied by representatives of Administrator in conjunction with Company representative.

7.7    Company shall pay all costs directly attributable to loss control, inspection(s) and/or audit(s) of the insureds as dictated by the Company's Underwriting Guidelines.

## VIII.  INSURANCE AND INDEMNITY

8.1    Administrator is required to maintain in full force and effect the following policies issued by an insurer rated no less than "A-" by A.M. Best Company during the Term of this Agreement and thereafter while Administrator has any obligations hereunder:

   a.    errors and omissions insurance covering Administrator and its employees in the minimum amount of Five Million dollars ($5,000,000); with a per claim or occurrence deductible or retention not to exceed Twenty-Five Thousand dollars ($25,000); and

   b.    fidelity insurance covering Administrator and its employees in the minimum amount of Two Hundred Fifty Thousand dollars ($250,000); or such greater amount or different terms as may be stipulated by the Company; and

c.  comprehensive general liability insurance (including personal injury) covering Administrator's employees in the minimum amount of One Million dollars ($1,000,000) single limit per occurrence covering Administrator and its employees; and

d.  automobile liability insurance covering Administrator's employees in the minimum amount of One Million dollars ($1,000,000) single limit per occurrence; and

e.  workers compensation insurance in at least the minimum amounts required to be maintained by Administrator by any applicable statute or regulation.

Such insurance shall be maintained by Administrator at its sole cost and expense and shall be primary and noncontributing coverage with regard to any valid and collectible insurance available to Company. Administrator shall request its insurers to provide thirty (30) days prior notification to Company, and Administrator agrees to immediately notify Company when it receives notice of lapse, increased deductibles, decreased coverage, or upon receipt of a notice terminating coverage. Administrator shall furnish proof of such insurance to the Company prior to initiation of this Agreement. On or before October 1 of each year, Administrator shall provide proof of each renewal policy thereof. Administrator shall provide notification to the Company in the event of lapse of such coverage. Administrator further agrees to notify Company of any claim brought under any such policy whether or not such claim arises out of or is connected with the policies written hereunder.

8.2  At all times hereafter, Administrator agrees to defend, indemnify, and hold Company harmless from and against all claims, actions, causes of action, liability, or loss which result from any real or alleged negligent or willful acts, errors, or omissions of Administrator, or the servants, employees, representatives, producers, or brokers of Administrator in the performance or breach of duties under this Agreement, including but not limited to soliciting, quoting, underwriting, and/or binding policies prohibited under Section 3.1. Administrator further agrees that in the event Company is in violation of any state code, statute, regulation, or bulletin due to the negligent or willful acts, errors, or omissions of Administrator, or the servants, employees, representatives or producers of Administrator, then Administrator shall assume the responsibility and liability for such act and shall indemnify and hold Company harmless for such liability and loss. Loss shall include, but not be limited to, all damages, costs, expenses, reasonable attorneys' fees and other legal fees, penalties, fines, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible by law), and any other expense or expenditure incurred by Company.

This Section 8.2 shall survive termination of this Agreement.

8.3  In all third party liability claims asserted against the Company, wherein the Administrator shall defend and indemnify the Company, the Administrator shall notify the Company within 24 hours of receipt of such claim. The Company shall have the right to retain counsel of its own selection, at the Administrator's expense, to provide a defense to the Company. The Company's written consent must be obtained prior to any settlement, which consent will not be unreasonably withheld. If Administrator, within a reasonable time after receiving notice of a claim from Company, fails to defend, Company shall have the right, but not the obligation, to undertake the defense, compromise, or settlement of such claim on behalf of, for the account of and at the risk of Administrator.

IX.  **TERMINATION OF THIS AGREEMENT**

9.1   This Agreement may be terminated with or without cause, upon 90 days prior written notice or as required by law. If this Agreement is terminated, with or without cause, Administrator's authority to place new policies or renew policies shall cease immediately upon receipt of the notice of termination or as required by law, unless Company advises Administrator that such right to place new or renewal policies continues until the effective date of termination or upon a date so designated by Company. The Company may suspend the underwriting authority of the Administrator during the pendency of a dispute regarding the cause for termination.

9.2   <u>Termination by Company</u>. Notwithstanding Section 9.1 above, Company may terminate this Agreement for cause, in whole or part, upon written notice to be effective immediately, unless otherwise indicated, which shall include, but is not limited to, the following:

   a.   Administrator, or its parent or any affiliated corporation becomes insolvent, institutes or acquiesces in the institution of any bankruptcy, financial reorganization, or liquidation proceeding or any such proceeding is instituted against Administrator or its parent corporation and remains undismissed for thirty (30) days (Administrator shall immediately notify Company of same); or

   b.   Administrator, or the owner of a controlling interest in Administrator, sells, exchanges, transfers, assigns, consolidates, pledges or causes to be sold, exchanged, transferred, assigned, consolidated, or pledged, all or substantially all of the stock or assets of Administrator, or any entity controlling Administrator, to a third party without a 60-day written notice to Company; or

   c.   Administrator fails to maintain a staff qualified to service the policies or to maintain the quality of services and obligations necessary to operate within this Agreement; or

   d.   Administrator fails to render timely and proper reports or premium accounting as required, or to remit premiums when due after ten (10) days written notice from Company; or

   e.   Administrator fails to maintain premium funds in the amount and manner required in this Agreement; or

   f.   Administrator engages in acts or omissions constituting abandonment, fraud, insolvency, misappropriation of funds, material misrepresentation, or gross and willful misconduct; or

   g.   Administrator's license or certificate of authority is canceled, suspended, or is declined renewal by any regulatory body within the Territory where Administrator transacts or services policies if, after ninety (90) days, Administrator fails to remedy such loss of license (Administrator shall immediately notify Company of same); or

   h.   If Administrator breaches this Agreement after written notice of such breach has been given to Administrator and Administrator has failed to cure within a five (5) day notice period; or

   i.   Administrator binds risks (i) that are unacceptable in accordance with the underwriting guidelines, procedures, instructions or memoranda provided for herein, or (ii) with limits in excess of those specified in the underwriting authority limits provided for herein, or (iii) with rates or policy forms or filings in a jurisdiction

TA - PAA

where Administrator has knowledge that required regulatory approvals have not been met; or

j.   Administrator fails to permit Company to inspect or audit any records or files relating to the policies; or

k.   Company determines that due to any initiative, referendum, judicial, legislative, or regulatory acts, the policies are not economically feasible; or

l.   Company is unable to maintain reinsurance acceptable to Company; or

m.   Administrator fails to provide Company with evidence of insurance as required by Section 8.1 of this Agreement; or

n.   an order of suspension or revocation of Administrator's license by any insurance regulatory authority; or

o.   a conviction against Administrator or any of Administrator's executive officers of violation of the insurance laws or regulations of any jurisdiction or of any law constituting a felony in the jurisdiction in which committed, or of any law whose violation reflects adversely upon the honesty or integrity of Administrator or any of Administrator's executive officers whether or not classified as a felony; or

p.   the number of complaints received by Administrator relating to Administrator's performance and service to insureds, policyholders, sub-producers or members of the public is excessive, as may be determined by Company in its sole discretion.

9.3   <u>Termination by Administrator.</u>  Notwithstanding Section 9.1 above, upon written notice, Administrator may immediately, unless otherwise indicated, terminate this Agreement in whole or in part, for cause, which shall include, but is not limited to, the following:

a.   Company, or its parent or subsidiary or affiliated companies institute or acquiesce in the institution of any bankruptcy, financial reorganization or liquidation proceeding, or any such proceeding is instituted against Company and remains undismissed for thirty (30) days; or

b.   Company's license or certificate of authority is canceled or declined renewal by any regulatory body within the Territory where Company is issuing policies hereunder, if after ninety (90) days Company fails to remedy such loss of license.

9.4   <u>Continued Servicing:</u>  Administrator agrees that in the event this Agreement is terminated, then Administrator shall continue to perform all customary and necessary services regarding all policies previously issued by Administrator on behalf of Company in accordance with the provisions of this Agreement until all such policies have been completely canceled, non-renewed, or otherwise terminated; provided, however, that Company may, in its sole discretion, immediately suspend or terminate Administrator's continuing service obligation hereunder.

Administrator's continuing service obligations after termination of the Agreement shall include, but not be limited to:

a.   the issuance and countersignature of appropriate endorsements to policies when so authorized in writing by Company, provided that such endorsements shall not

TA - PAA                    Page 12 of 23

increase Company's liability, except as required by law, or extend the term of any policy without prior written approval of Company; and

b. the issuance of all applicable cancellation and/or non-renewal notices in full and complete compliance with the insurance code(s) or regulations within the Territory where Administrator was authorized to write for Company and in accordance with any written instructions that may be issued by Company; and

c. the collection and remittance of all premiums due on the policies hereunder; and

d. the full compliance with all applicable laws, regulations, rules, and requirements regarding any and all continuing service obligations the Administrator performs; and

e. the reporting of sufficient information to satisfy any reporting requirements as addressed in Section 4.9 of this Agreement; and

f. the maintenance, transmission to Company, and availability for inspection of all financial, claims, policy, and underwriting records as provided in this Agreement; and

g. the obligations set out in Section 4 of this Agreement; and

h. any other obligations necessary or appropriate to ensure the proper winding-up of the relationships created by this Agreement.

If Administrator fails in any respect to fulfill this continuing service obligation, then Administrator shall reimburse Company any expense incurred by Company to service or arrange for the servicing of the policies issued by or through Administrator hereunder or such amounts may be offset by Company.

9.5    As long as Administrator makes all payments hereunder and continues to be in compliance with all terms of this Agreement, Administrator may deal directly with all other licensed persons or entities with respect to the policies hereunder, including but not limited to, the right to collect from and to return premiums directly to all producers, brokers, or insureds. If Administrator has not made all payments hereunder or is not in compliance with the terms of this Agreement, upon Company providing written notice to Administrator hereunder, Company is authorized to deal directly with all other licensed persons or entities with respect to the policies hereunder, including but not limited to, the right to collect from and to return premiums directly to all producers, brokers, or insureds.

9.6    Notwithstanding anything else set forth herein to the contrary, if Administrator breaches this Agreement for any reason whatsoever, or fails to comply with any instructions or directions of Company, Company may immediately suspend some or all of the authority of Administrator under this Agreement. Additionally, Company may suspend the authority of Administrator during the pendency of any dispute regarding termination or suspension, and such suspension shall not be considered a default under the terms of this Agreement. Notice of such suspension may be by telephone, facsimile, first class mail, or other common method of communication, and, upon receipt of such notice, Administrator shall thereupon cease to exercise such power or powers in accordance with such notice.

This Section 9.6 shall survive termination of this Agreement.

9.7    <u>Ownership of Expirations:</u>

TA - PAA

a.    Records of insureds, policyholders and policies and their use and control for solicitation of business written or bound by or through Administrator ("Expirations"), as between Administrator and Company, shall be the sole and exclusive property of Administrator except:

    1.    Underwriting records and files:

    2.    The ownership, use and control of those policies that were submitted by other licensed producers shall be governed by the terms of the contracts between those producers and Administrator, except to the extent that a.3. below becomes applicable.

    3.    If Administrator's authority under this Agreement is suspended or terminated in part or in full for cause under IX, 9.2, a., b., f., h., j., or o., the records, use and control of expirations and other necessary files and materials shall be accessible to the Company or company's representative at the Company's request. This will include the ability to copy and remove any material which the Company determines necessary to policy holder servicing and regulatory compliance. During the period of suspension or termination in part or in full, no commission will be paid to the Administrator.

    4.    If Administrator's authority under this Agreement is suspended or terminated due to failure of Administrator to render all accounts due or pay any amounts due to Company except minor accounting differences, and Administrator fails to cure the breach on five (5) days notice from Company to Administrator, the records, use, and control of expirations shall be vested in the Company, until such time as the Administrator has accounted for and paid over to the Company all sums due the Company under the terms of this Agreement, at which time the records, use, and control of expirations shall remain the property of the Administrator.

b.    Upon the occurrence of any event which gives rise to the vesting of the ownership of expirations in Company, Company may take immediate possession of all records relating to those expirations and Administrator shall upon request immediately gather such records together at Administrator's principal place of business and allow Company access to take possession of those records. Company may service those expirations directly or dispose of them in any commercially reasonable manner. Company may collect premiums directly from any insured or policyholder who has not made payment to Administrator.

c.    If, in disposing of Administrator's records and expirations, Company does not realize sufficient money to discharge in full any and all of Administrator's indebtedness to Company (including reasonable costs incurred by Company in connection with its recovery and disposal of the records and expirations), Administrator will remain liable to Company for the balance of the Administrator's indebtedness to Company. Administrator shall have no right to or interest in any commissions which may be generated as a result of Company's servicing those expirations.

d.    If there is any excess over Administrator's indebtedness to Company (include any cost incurred by Company in connection with its recovery and disposal of records and expirations), realized by Company, it shall be remitted to Administrator.

This section 9.7 shall survive termination of this Agreement.

9.8    Company and Administrator hereby acknowledge and agree that this Agreement is a personal service contract between the parties and a request for financial accommodation by the Company for the benefit of the Administrator. This Agreement may not be assumed and/or

assigned in a bankruptcy case under Title 11 of the United States Code or insolvency proceedings in any court having jurisdiction. Subject to 9.4 hereof, the Agreement shall automatically terminate without notice in the event that either party becomes insolvent, unable to meet debts as they mature, makes an assignment for the benefit of creditors, voluntarily or involuntarily enters liquidation, rehabilitation, bankruptcy, or receivership proceedings, liquidates or terminates its business activities.

## X.    GENERAL PROVISIONS

10.1    Notice. Except as otherwise set forth herein, any notice required under this Agreement must be in writing and either sent by first class mail, facsimile, certified mail, or personally delivered. Notice shall be effective either upon receipt or five (5) days after mailing to the other party, whichever comes first. Unless changed, the addresses of the respective parties are:

**Administrator:**
Thorson and Associates Insurance Services, Inc.
30699 Russell Ranch Road, Suite 200
Westlake Village, CA 91362
Attn: David Thorson, President

**Company:**
Berkley Underwriting Partners LLC
215 Shuman Boulevard, Suite 200,
Naperville, IL 60563
Phone: 630-210-0360
Fax: 630-210-0376
Attn: John S. Diem, President

10.2    Integration, Waiver, and Amendment. This Agreement constitutes the entire agreement between Company and Administrator and supersedes any and all other agreements, either oral or written, between Company and Administrator with respect to the policies. No waiver by either party to enforce any provision of this Agreement will be effective unless made in writing and signed by an authorized officer of Company and Administrator and shall be effective as to the specifically stated waiver. No amendment to this Agreement will be effective unless made in writing and signed by the parties hereto, and specifying the effective date of such amendment.

10.3    Remedies Not Exclusive. No right or remedy set forth in this Agreement is exclusive of any other right or remedy but shall be in addition to every other right and remedy given under this Agreement or existing now or hereafter at law or equity.

10.4    Severability. Wherever possible, each provision of this Agreement will be interpreted in such a manner and to such an extent as to be effective and valid under applicable law. If any provision is prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity.

10.5    Applicable Law. This Agreement shall be interpreted, governed and enforced by and construed in accordance with the laws of the State of Illinois, without regard to its rules regarding conflict of laws.

10.6    Jurisdiction and Right of Action. Any dispute arising out of, under, or in connection with the terms, conditions or enforcement of any of the provisions of this Agreement shall be

TA - PAA

submitted and litigated in Chicago, Illinois and Administrator hereby submits to the jurisdiction of the United States District Court for the Northern District of Illinois, Eastern Division or the Illinois State Court located in Chicago, Illinois, for purposes of the enforcement of the provisions of this Agreement.

The Administrator and the Company hereby agree to waive their right to jury trial for purposes of resolving any dispute arising out of, under, or in connection with this Agreement.

This Section 10.6 shall survive termination of this Agreement.

10.7   Conformance to Law.  This Agreement and the provisions relating to commissions shall, without prior notice, be automatically modified to conform with any law or governmental regulation having application to or jurisdiction over the subject matter of the parties hereto, and the parties shall promptly amend the Agreement to comply with such modifications.

Should any provision of this Agreement be declared or determined by any court to be illegal or invalid, the validity of the remaining part, terms or provisions shall not be affected thereby and said illegal or invalid part, term or provision shall be deemed not to be part of this Agreement.

10.8   Other Companies.  Administrators agrees to advise Company and it is agreed that Company retains the right of first refusal as respects any existing and future insurance  risks that fall within the underwriting guidelines, memoranda, or filings for the Petroleum Dealers Program, as well as all insurance programs related to the Petroleum Dealers Program.

10.9   Non-Assignability/Non-Delegation.  Administrator may neither delegate its duties nor assign its rights under this Agreement, unless otherwise agreed upon and authorized in writing by a Senior Vice President or more senior officer of Company.

10.10   Guarantee/Surety.  If a Guarantor or Surety has agreed, by separate written instrument, to guarantee the obligations Administrator has assumed herein, any changes made by amendment of this Agreement or any Exhibits, Schedules, or Addendum(s) attached hereto relating to a class or classes of policies, Territory, commissions, reports, records, or accounting shall be deemed to be a contemplated change and not an alteration of the original obligation.

10.11   Confidentiality and Non-disclosure.  Administrator agrees that all customer information disclosed by the Company to Administrator shall remain confidential and shall not be disclosed by Administrator to any individual, corporation, other business organization or governmental agency unless required by law or in conformity with the Company's Privacy Notice, and Administrator shall use such customer information only for the purpose for which the Company has provided such customer information to Administrator.

10.12   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but which together shall constitute one and the same instruments.

10.13   Compliance with Law.  Administrator shall comply with the requirements of all applicable federal, state and local laws, rules and regulations of all insurance regulatory authorities, including but not limited to the Violent Crime Control and Law Enforcement Act of 1994, and Title V of the Gramm Leach Bliley Act and any other state regulatory privacy provisions. Administrator agrees to adhere to and comply with the Company's Privacy Notice, which shall be provided to you from time to time.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed effective as of the date and year first above written.

**Administrator:**                                    **Company:**

Signed: _____          Signed: _John Diem_____

Name: _David Hudson_____          Name: _John Diem_____

Title: _President_____          Title: _President_____

## EXHIBIT A

## UNDERWRITING AUTHORITY

A.  Territory

The Administrator's "Territory" shall be defined within the Underwriting Guidelines, Appendix B.

B.  Authorized Lines/Products

The Administrator's "Authorized Lines/Products" for this Agreement are as follows:

Primary General Liability, Property and Commercial Automobile

C.  Limits of Authority

The Administrator's maximum "Limits of Authority" to be written are as follows:

$1,000,000, with a maximum aggregate policy limit not to exceed $10,000,000

D.  Maximum Annual Premium Volume

The maximum premium volume to be written by Administrator for this Agreement on an annual basis is as follows:

$75,000,000

E.  Exclusions

The following is excluded from this Agreement and the policies written by Administrator under this Agreement:

Monoline commercial automobile coverage
Monoline property coverage
Self-insured retention plans
Umbrella coverage
Workers Compensation coverage

F.  Rating

Administrator shall only use the rates and underwriting rules approved by the Company and filed with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so required.

G.  Forms

Administrator shall only use the policy forms and endorsements approved by the Company and filed with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so required.

TA - PAA                            Page 18 of 23

Manuscripted endorsements may be filed and used only with the prior approval of Company and regulatory approval, if required.

H.  Maximum Policy Period

The maximum policy period to be offered by Administrator is:  Twelve (12) Months.

I.  Policy Cancellation Provisions

Administrator shall follow the policy cancellation provisions contained within those policy forms and endorsements approved by the Company and filed with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so required, or as required otherwise by regulation.

J.  Deviations

Any deviations to the above items may be written by Administrator only with the prior written approval of Company.

**EXHIBIT B**

**PREMIUM TRUST ACCOUNT GUIDELINES**

The following guidelines have been established by Company for the selection of banks and the criteria for determining acceptable investments for maintenance of Company's Premium Trust Funds.

A.  Banking Standards

   The Company will approve all depository accounts based upon size and financial condition of the bank. The bank must also be a member of the Federal Deposit Insurance Corporation (FDIC).

B.  Premium Trust Accounts

   1.  Premium Trust Funds must be maintained in a trustee bank account in an amount at least equal to the net written premiums (unpaid to Company), and return premiums (unpaid to policyholders or insureds) received by Administrator, net of Administrator's commissions.

   2.  The bank account and/or depository title must indicate that this is a trust account in the name of Administrator/Company.

   3.  Copies of bank and investment statements for such bank accounts and/or depository(ies) shall be sent to the attention of Company's designee upon request.

C.  Maintenance of Fiduciary Funds

   1.  Administrator shall maintain such Premium Trust Funds at all times in a trustee bank account or depository separate from any other account of depository and as follows:

      a.  checking account, demand account, or savings account, each of which shall be designated as a trust account; or

      b.  in United States government bonds and treasury certificates or other obligations for which the full faith and credit of the United States are pledged for payment of principal and interest; or

      c.  in certificates of deposit of banks approved by Company and licensed by any state government within the United States or the United States government.

Notwithstanding the above, Company reserves the right to change the above Guidelines from time to time in his or her sole discretion.

These Guidelines shall survive termination of the Agreement.

TA - PAA                         Page 20 of 23

## EXHIBIT C

## ALLOWANCES AND COMMISSIONS

The Company will allow the Program Administrator a provisional commission of 19% of the Company's gross net written premium at a 55% loss ratio.

Commission Adjustment: If the actual Loss Ratio is 55% the adjusted commission is 19%. If the actual Loss Ratio is less than 55%, but greater than or equal to 49%, the adjusted commission rate for the Underwriting Year period under consideration shall be 19% plus 0.5% for each 1% decrease in the Loss Ratio beginning at a 55% Loss Ratio. If the actual Loss Ratio is greater than 55%, but equal to or less than 61%, the adjusted commission rate for the Underwriting Year period under consideration shall be 19% minus 0.5% percent decrease in commission for each 1% increase in Loss Ratio, beginning at a 55% Loss Ratio. The Minimum Commission is 16.5% at a 60% or higher Loss Ratio and the maximum commission is 22% at a 49% or lower Loss Ratio.

All commission adjustments will be made on a proportional basis.

Underwriting Year as used herein shall mean the period from October 1, 2004, through October 1, 2005, and each subsequent 12-month period shall be a separate Underwriting Year. For each Policy written under the terms of this Agreement, the Underwriting Year that any such Policy belongs to is based on the following:

1.      As respects all new Policies, the effective date of such Policies.
2.      As respects all renewal Policies that have a policy term of one year or less, the renewal date of such Policies,
3.      As respects renewal Policies that have a Policy term greater than one year, but not greater than 18 months, the renewal date of such Policies.

All premium and loss arising from Policies written under the terms of this agreement shall be allocated to the Underwriting Year of such Policy regardless of the calendar year such premium is earned or the date of any loss occurrence.

The above referenced loss ratio is calculated as follows:

|   | Deficit Carry forward, if any, from previous Underwriting Years |
|---|---|
| + | Paid losses |
| + | Paid allocated loss adjustment expenses |
| + | Outstanding losses |
| + | Outstanding allocated loss adjustment expenses |
| + | Incurred but not reported losses as calculated by Company actuary |
| = | Total incurred losses |
| / | Earned Premiums |

The first calculation for any adjustment period shall be made 24 months after the end of each Underwriting Year with adjustments made annually thereafter with the final calculation occurring 84 months after the end of each Underwriting Year, at which time no further adjustment to that Underwriting Year will be made. Payment shall be made within 30 days of the adjustment. Any amounts due Company or Program Administrator will be paid according to the following schedule:

1.      at the first adjustment calculation for an Underwriting Year, 1/3 of any amount shown to be due will be paid by the debtor party;
2.      at the second adjustment calculation for an Underwriting Year, 2/3 of any amount shown to be due will be paid by the debtor party; and

TA - PAA                         Page 21 of 23

3.     at the third and subsequent adjustment calculations, 100% of any amounts shown to be due will be paid by the debtor party.

The Commission calculation is to include an unlimited deficit carry forward provision. A deficit occurs when the loss ratio calculated above exceeds 61%. The deficit carry forward amount is calculated as the difference between the loss ratio calculated above and 61% multiplied times the earned premium for the Underwriting Year.

Administrator agrees to adequately collateralize the difference between the amount of commission paid by the Company and 16.5%, in either an escrow account or a Letter of Credit from a bank and in a form acceptable to the Company. However, in no event will the amount of collateral exceed 3% of written premium for the Underwriting Year. Adequate collateral shall be defined as an amount at least equal to the cumulative amount of the commission difference.

If the escrow account option is chosen as collateral, the Administrator agrees to establish a Company-Approved Account ("Account") with a financial institution approved by the Company with the Account established for the exclusive benefit of the Company. The Program Administrator's rights to this Account shall be solely limited to the deposit of adequate collateral into the Account with no rights by the Program Administrator to withdraw from the Account unless approved in writing prior thereto by the Company.

The collateral requirement will expire 60 months after the end of each Underwriting Year. The collateral requirement for each Underwriting Year will be calculated separately.

TA - PAA

**EXHIBIT D**

**ADMINISTRATOR CERTIFICATION**
**VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994**

Congress has passed the "Violent Crime Control and Law Enforcement Act of 1994" (the "Act"). This Act prevents anyone from engaging in the business of insurance if convicted of a criminal felony involving dishonesty or a breach of trust, unless the "individual" (as defined within the Act) receives the prior written consent of any insurance regulatory official with regulatory authority over the individual. Subject to the provisions of the Act, an insurer may be liable for willfully permitting a prohibited individual to engage in the business of insurance or to participate in such business.

As a result, Berkley Underwriting Partners is requiring the following questions to be answered. By signing this document, you acknowledge that the statements made are true, complete and correct in all respects and you understand that background checks may be obtained.

1.    Has the Administrator ever been convicted of a felony?  _____no_____ (yes or no)

2.    Has any officer, director or shareholder of the Administrator ever been convicted of a felony?
       _____no_____ (yes or no)

3.    Has any individual person employed by the Administrator who will render services to the Company ever been convicted of a felony?  _____no_____ (yes or no)

4.    If you answered in the affirmative to any of the above questions, please explain:

       _____

       _____

       _____

I swear that the above information is true, complete and correct in all respects. I understand and acknowledge that the Administrator has an on-going obligation to disclose any criminal felony immediately to the Company. I also understand and agree that the Company may obtain a criminal background check and/or credit history on me or the Administrator at their discretion. I certify that I have the corporate power and authority to execute the foregoing.

IN WITNESS WHEREOF, I, _David Thomson_, execute this Certification this _6th_ day of _September_, 20_04_.

Administrator:

Signed: _____

Title: _____

TA - PAA                          Page 23 of 23

**EXHIBIT 2**





**StarNet**
INSURANCE COMPANY
A Berkley Insurance Company
475 Steamboat Road, Greenwich, CT 06830 (203) 542-3800

| Program Administrator: |
| --- |
| Thorson Insurance Services |
| 30699 Russell Ranch Rd., Suite 200 |
| Westlake Village, CA 91362 |

# COMMERCIAL GENERAL LIABILITY DECLARATIONS

POLICY NUMBER: TSG0000015-00                    PRIOR POLICY NUMBER:

NAMED INSURED:   **Red Carpet Carwash, Inc., dba: Red Carpet Car wash**

MAILING ADDRESS:   **2414 Sepulveda Blvd**

**Manhattan Beach,  CA 90266**

POLICY PERIOD:   FROM   **11/10/2004**   TO   **11/10/2005**
At 12:01 A.M. at your mailing address shown above

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

## LIMITS OF INSURANCE

| | | | |
| --- | --- | --- | --- |
| EACH OCCURRENCE LIMIT | $ 1,000,000 | | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $ 100,000 | | Any one premises |
| MEDICAL EXPENSE LIMIT | $ Excluded | | Any one person |
| PERSONAL & ADVERTISING INJURY LIMIT | $ 1,000,000 | | Any one person or organization |
| GENERAL AGGREGATE LIMIT | | $ 2,000,000 | |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | | $ 2,000,000 | |

## RETROACTIVE DATE (CG 00 02 ONLY)

THIS INSURANCE DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" WHICH OCCURS BEFORE THE RETROACTIVE DATE, IF ANY, SHOWN BELOW.
RETROACTIVE DATE:   None

(ENTER DATE OR "NONE" IF NO RETROACTIVE DATE APPLIES)

## DESCRIPTION OF BUSINESS

FORM OF BUSINESS:

[ ] INDIVIDUAL          [ ] PARTNERSHIP          [ ] JOINT VENTURE

[ ] LIMITED LIABILITY COMPANY     [X] ORGANIZATION, INCLUDING A CORPORATION (BUT NOT INCLUDING A PARTNERSHIP, JOINT VENTURE, OR LIMITED LIABILITY COMPANY)

BUSINESS DESCRIPTION:   **Full Service Car Wash**

## ALL PREMISES YOU OWN, RENT, OR OCCUPY

LOCATION NUMBER          ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY

| See Location Schedule 'A' |
| --- |
| Attached Here Within |

COMMERCIAL GENERAL LIABILITY DECLARATIONS (Continued)    POLICY NUMBER: TSG0000015-00

| LOCATION NUMBER | CLASSIFICATION | CODE NUMBER | PREMIUM BASE | RATE | | ADVANCE PREMIUM | |
|---|---|---|---|---|---|---|---|
| | | | | Prem/Ops | Prod/Comp Ops | Prem/Ops | Prod/Comp Ops |
| | See Location Schedule 'A' and Premium Schedule Attached Here Within | | | $ | $ | $ | $ |

**CLASSIFICATION AND PREMIUM**

| | |
|---|---|
| PREMIUM SHOWN IS PAYABLE | STATE TAX OR OTHER (if applicable)    $ _____ |
| | TOTAL PREMIUM (Subject to Audit)    $    14,866 |
| | AT INCEPTION    $ _____ |
| | AT EACH ANNIVERSARY    $ _____ |
| | (IF POLICY PERIOD IS MORE THAN ONE YEAR AND PREMIUM IS PAID IN ANNUAL INSTALLMENTS) |

**FORMS AND ENDORSEMENTS APPLICABLE:**

See Attached Schedule of Policy Forms and Endorsements.

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) COMPLETE THE ABOVE NUMBERED POLICY.

| Countersigned:    January 13, 2005 | By: |
|---|---|
| Date | Authorized Representative |

IN WITNESS WHEREOF, StarNet Insurance Company designated herein has executed and attested these presents; but this policy shall not be valid unless issued by the Program Administrator hereinbefore mentioned.

_____
Secretary

_____
President

## PREMIUM SCHEDULE

This schedule forms a part of

Policy Number:   TSG0000015-00          of the      StarNet Insurance Company

Issued to:    Red Carpet Carwash, Inc.

Red Carpet Car wash

| Classification | Code No. | State | Premium Basis | Rate | | Advance Premium | |
|---|---|---|---|---|---|---|---|
| | | | | Pr/CO | All Other | Pr/CO | All Other |
| Car Wash - Other than Self Service | 10367 | CA | 851,460 | 0.00 | 16.97 | $0.00 | $14,451.00 |
| Grocery Store -NOC | 13673 | CA | 155,000 | 0.28 | 2.39 | $44.00 | $371.00 |

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

© ISO Properties, Inc., 2000    CG 00 01 10 01    ☐

**EXHIBIT 3**



# THORSON & ASSOCIATES

## INSURANCE SERVICES AND RISK MANAGEMENT
### A California Corporation

Westlake North Business Park
30699 Russell Ranch Road
Suite No. 200
Westlake Village, CA 91362
(818) 889-7240
Fax (818) 889-2580

September 20, 2004

Red Carpet USA, LLC
2414 N. Sepulveda Blvd
Manhattan Beach, CA 90266

Subject:         Commercial Package (Car Wash)
Policy#          TAP50020-03
Expiration       11/10/2004

Dear Mr. Elbaum,

You will be receiving a notice of non renewal notice on the above captioned policy shortly.
Please do not be concerned!   Thorson Insurance Services has replaced the Petroleum
Dealers Program with a new carrier and we look forward to working with you on your
upcoming renewal.

As discussed with Vince Polimeni the new program carrier(s) are part of the WR Berkley
Family of Companies (Starnet & Gemini Insurance), and hold an AM Best rating of A+.   We
are confident you will be pleased with the carrier transition.  We are pleased that Berkeley
has been secured take over the Clarendon National program.  We will be offering you a
quality Package Quotation for your General Liability and Commercial Property including non
auditable policies and excellent claim handling.

As per your request, enclosed please find your loss runs currently valued for the period of
2000 – 2004.

Thank you for being a valued client for the past 10+ years in our Petroleum Dealers
Program!  We appreciate your business and look forward to continued service of your
insurance needs.

Warmest Regards,

Maria Sanchez
Account Manager

Cc:  Vince Polimeni

A Division of
Thorson & Associates
Insurance Services, Inc.
License No. 0800836

**EXHIBIT 4**



**StarNet**
INSURANCE COMPANY
A Berkley Insurance Company
475 Steamboat Road, Greenwich, CT 06830 (203) 542-3800

| Program Administrator: |
| --- |
| Thorson Insurance Services |
| 30699 Russell Ranch Rd., Suite 200 |
| Westlake Village, CA 91362 |

# COMMERCIAL GENERAL LIABILITY DECLARATIONS

POLICY NUMBER: TSG0000059-00                    PRIOR POLICY NUMBER:

| | |
| --- | --- |
| NAMED INSURED: | **Golden Bear Transportation Inc., dba: Golden Bear Transportation** |
| MAILING ADDRESS: | **3410 E. Foothill Blvd.** |
| | **Pasadena, CA 91107** |
| POLICY PERIOD: | FROM **12/31/2004** TO **12/31/2005** |
| | At 12:01 A.M. at your mailing address shown above |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| LIMITS OF INSURANCE | | |
| --- | --- | --- |
| EACH OCCURRENCE LIMIT | $ 1,000,000 | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $ 100,000 | Any one premises |
| MEDICAL EXPENSE LIMIT | $ Excluded | Any one person |
| PERSONAL & ADVERTISING INJURY LIMIT | $ 1,000,000 | Any one person or organization |
| GENERAL AGGREGATE LIMIT | $ 2,000,000 | |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $ 2,000,000 | |

| RETROACTIVE DATE (CG 00 02 ONLY) |
| --- |
| THIS INSURANCE DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" WHICH OCCURS BEFORE THE RETROACTIVE DATE, IF ANY, SHOWN BELOW. |
| RETROACTIVE DATE:    None |
| (ENTER DATE OR "NONE" IF NO RETROACTIVE DATE APPLIES) |

| DESCRIPTION OF BUSINESS |
| --- |
| FORM OF BUSINESS: |
| ☐ INDIVIDUAL          ☐ PARTNERSHIP          ☐ JOINT VENTURE |
| ☐ LIMITED LIABILITY COMPANY   ☒ ORGANIZATION, INCLUDING A CORPORATION (BUT NOT INCLUDING A PARTNERSHIP, JOINT VENTURE, OR LIMITED LIABILITY COMPANY) |
| BUSINESS DESCRIPTION:   **Petroleum Distributor** |

| ALL PREMISES YOU OWN, RENT OR OCCUPY |
| --- |
| LOCATION NUMBER          ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
| See Location Schedule 'A' Attached Here Within |

CG DS 77 00 01 04     © 2000 Includes Material Copyrighted by ISO Properties, Inc. with permission     Page 1 of 2

COMMERCIAL GENERAL LIABILITY DECLARATIONS (Continued)    POLICY NUMBER:    TSG0000059-00

| CLASSIFICATION AND PREMIUM | | | | | | | |
|---|---|---|---|---|---|---|---|
| LOCATION NUMBER | CLASSIFICATION | CODE NUMBER | PREMIUM BASE | RATE | | ADVANCE PREMIUM | |
| | | | | Prem/Ops | Prod/Comp Ops | Prem/Ops | Prod/Comp Ops |
| | See Location Schedule 'A' and Premium Schedule Attached Here Within | | | $ | $ | $ | $ |

| PREMIUM SHOWN IS PAYABLE | STATE TAX OR OTHER (if applicable) $ _____ |
|---|---|
| | TOTAL PREMIUM (Subject to Audit) $  15,612 |
| | AT INCEPTION                                   $ _____ |
| | AT EACH ANNIVERSARY                       $ _____ |
| | (IF POLICY PERIOD IS MORE THAN ONE YEAR AND PREMIUM IS PAID IN ANNUAL INSTALLMENTS) |

**FORMS AND ENDORSEMENTS APPLICABLE:**

See Attached Schedule of Policy Forms and Endorsements.

**THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) COMPLETE THE ABOVE NUMBERED POLICY.**

| Countersigned:    January 31, 2005 | By: |
|---|---|
| Date | Authorized Representative |

IN WITNESS WHEREOF, StarNet Insurance Company designated herein has executed and attested these presents; but this policy shall not be valid unless issued by the Program Administrator hereinbefore mentioned.

_____
Secretary

_____
President

# PREMIUM SCHEDULE

This schedule forms a part of

Policy Number:   TSG0000059-00          of the   StarNet Insurance Company

Issued to:   Golden Bear Transportation Inc.
Golden Bear Transportation

| Classification | Code No. | State | Premium Basis | Rate Pr/CO | All Other | Advance Premium Pr/CO | All Other |
|---|---|---|---|---|---|---|---|
| Gasoline Distributor | 53907 | CA | 10,588,200 | 0.38 | 0.97 | $4,055.00 | $10,292.00 |

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

**EXHIBIT 5**

*Golden Bear Marketing & Transportation Inc.*

## Premium Summary

| Coverage | Quoted Premium |
|---|---|
| General Liability and Property | $18,431 |
| Commercial Auto (with changes: add 2006 Ford, Delete 97 Peterbilt, 84 Merit Tlr, 90 Lexus, add 2006 Kenworth) | $147,578 |
| Environmental Auto Liability-2MIL | $35,530 |
| Sub-Total | $201,539 |
| Surplus Lines Tax (3.225%) | $1145.84 |
| Broker Fee | $1,500 |
| Grand Total | $204,184.84 |

GL will not be audited
SEAL will not audited
Auto will be amended via endorsement during policy term

APPROVED
JAMES D'ABSANGELO
JAN 0 3 2006

Sign here to indicate your acceptance of the
insurance quotation as outlined above*:

Date of Acceptance*:

Agent's signature and date:

We agree to the terms, limits, conditions, exclusions and premium as quoted within this insurance
proposal. We understand we are responsible to update Thorson Insurance Services during the policy for
any changes in our operation, locations, or any other applicable matter in which insurance may be
affected.
We have read and agreed to the comments and conditions section of this proposal.
We understand that if we would like higher limits for any of the coverage's, we can request this now or
during the policy term and TIS will approach insurance carriers and respond in writing.

12/16/2005

## Thorson Insurance Services

*i* thorson

**EXHIBIT 6**



| Program Administrator: |
| --- |
| Thorson Insurance Services |
| 30699 Russell Ranch Rd., Suite 200 |
| Westlake Village, CA 91362 |



A Berkley Insurance Company
475 Steamboat Road, Greenwich, CT 06830 (203) 542-3800

# COMMERCIAL GENERAL LIABILITY DECLARATIONS

POLICY NUMBER: TSG0000036-00                         PRIOR POLICY NUMBER:

NAMED INSURED: **G&M Oil Company, Inc., dba: G & M Oil Company**
MAILING ADDRESS: **16868 "A" Street**
**Huntington Beach, CA 92647**

POLICY PERIOD:     FROM     **12/1/2004**     TO     **12/1/2005**
At 12:01 A.M. at your mailing address shown above

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| LIMITS OF INSURANCE | | |
| --- | --- | --- |
| EACH OCCURRENCE LIMIT | $ 1,000,000 | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $ 100,000 | Any one premises |
| MEDICAL EXPENSE LIMIT | $ Excluded | Any one person |
| PERSONAL & ADVERTISING INJURY LIMIT | $ 1,000,000 | Any one person or organization |
| GENERAL AGGREGATE LIMIT | $ 10,000,000 | |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $ 2,000,000 | |

| RETROACTIVE DATE (CG 00 02 ONLY) |
| --- |
| THIS INSURANCE DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" WHICH OCCURS BEFORE THE RETROACTIVE DATE, IF ANY, SHOWN BELOW. |
| RETROACTIVE DATE:     None |
| (ENTER DATE OR "NONE" IF NO RETROACTIVE DATE APPLIES) |

| DESCRIPTION OF BUSINESS |
| --- |

FORM OF BUSINESS:
☐ INDIVIDUAL          ☐ PARTNERSHIP          ☐ JOINT VENTURE

☐ LIMITED LIABILITY COMPANY     ☒ ORGANIZATION, INCLUDING A CORPORATION (BUT NOT INCLUDING A PARTNERSHIP, JOINT VENTURE, OR LIMITED LIABILITY COMPANY)

BUSINESS DESCRIPTION:  **Self Service Station with Mini-Mart**

| ALL PREMISES YOU OWN, RENT, OR OCCUPY | |
| --- | --- |
| LOCATION NUMBER | ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
| | **See Location Schedule 'A' Attached Here Within** |

CG DS 77 00 01 04     © 2000 Includes Material Copyrighted by ISO Properties, Inc. with permission          Page 1 of 2

COMMERCIAL GENERAL LIABILITY DECLARATIONS (Continued)    POLICY NUMBER:  TSG0000036-00

| | | | | RATE | | ADVANCE PREMIUM | |
|---|---|---|---|---|---|---|---|
| **LOCATION NUMBER** | **CLASSIFICATION** | **CODE NUMBER** | **PREMIUM BASE** | **Prem/Ops** | **Prod/Comp Ops** | **Prem/Ops** | **Prod/Comp Ops** |
| | See Location Schedule 'A' and Premium Schedule Attached Here Within | | | $ | $ | $ | $ |

**CLASSIFICATION AND PREMIUM**

PREMIUM SHOWN IS PAYABLE

STATE TAX OR OTHER (if applicable)    $ _____
TOTAL PREMIUM (Subject to Audit)    $   470,520
AT INCEPTION    $ _____
AT EACH ANNIVERSARY    $ _____
(IF POLICY PERIOD IS MORE THAN ONE YEAR AND PREMIUM IS PAID IN ANNUAL INSTALLMENTS)

**FORMS AND ENDORSEMENTS APPLICABLE:**
See Attached Schedule of Policy Forms and Endorsements.

**THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) COMPLETE THE ABOVE NUMBERED POLICY.**

| Countersigned:    January 28, 2005 | By: |
|---|---|
| Date | Authorized Representative |

IN WITNESS WHEREOF, StarNet Insurance Company designated herein has executed and attested these presents; but this policy shall not be valid unless issued by the Program Administrator hereinbefore mentioned.

Secretary                              President

# PREMIUM SCHEDULE

This schedule forms a part of

Policy Number:    TSG0000036-00                of the    StarNet Insurance Company

Issued to:    G&M Oil Company, Inc.
G & M Oil Company

| Classification | Code No. | State | Premium Basis | Rate Pr/CO | Rate All Other | Advance Premium Pr/CO | Advance Premium All Other |
|---|---|---|---|---|---|---|---|
| Gasoline Stations - self serve | 13454 | CA | 92,540,860 | 0.22 | 4.21 | $20,359.00 | $389,412.00 |
| Grocery Store -NOC | 13673 | CA | 12,010,500 | 0.39 | 3.39 | $4,684.00 | $40,680.00 |
| Package Stores and other retail establishment selling alcoholic beverages for consumption off premises (Liquor Liability) | 59211 | CA | 4,060,000 | 0.00 | 1.84 | $0.00 | $7,487.00 |
| Buildings Lessor Risk Alt other | 61212 | CA | 14,500 | 0.00 | 107.86 | $0.00 | $1,564.00 |
| Building or Premise Office Other than(not for profit) | 61226 | CA | 14,500 | 0.00 | 367.86 | $0.00 | $5,334.00 |

1

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

© ISO Properties, Inc., 2000

**EXHIBIT 7**

*G&M Oil Company Inc.*

*Premium Summary*

| Coverage | Annual Premium |
|---|---|
| General Liability | $470,456 |
| Commercial Auto | $70,904 |
| Commercial Property | $87,650 |
| Excess Liability | $158,000 |
| **Sub-Total** | $787,010 |
| Surplus Lines Tax | $7,922 |
| Broker Fee | $2,500 |
| **Grand Total** | $797,432 |

General Liability will not be subject to audit

Auto Endorsements will be processed during policy term

Sign here to indicate your acceptance of the
insurance quotation as outlined above:

Date of Acceptance: *11-30-04*

## Thorson & Associates
11/30/2004

**EXHIBIT 8**



**StarNet**
INSURANCE COMPANY
A Berkley Insurance Company
475 Steamboat Road, Greenwich, CT 06830 (203) 542-3800

| Program Administrator: |
| Thorson Insurance Services |
| 30699 Russell Ranch Rd., Suite 200 |
| Westlake Village, CA 91362 |



# COMMERCIAL GENERAL LIABILITY DECLARATIONS

POLICY NUMBER: TSG0000058-00                          PRIOR POLICY NUMBER:

NAMED INSURED:  **Palm Springs Oil Company, Inc, dba: Palm Springs Oil Company**
MAILING ADDRESS:  **3410 E. Foothill Blvd.**
**Pasadena,  CA 91107**

POLICY PERIOD:      FROM    **12/31/2004**    TO    **12/31/2005**
At 12:01 A.M. at your mailing address shown above

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| LIMITS OF INSURANCE | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $ 1,000,000 | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $ 100,000 | Any one premises |
| MEDICAL EXPENSE LIMIT | $ Excluded | Any one person |
| PERSONAL & ADVERTISING INJURY LIMIT | $ 1,000,000 | Any one person or organization |
| GENERAL AGGREGATE LIMIT | $ 10,000,000 | |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $ 2,000,000 | |

| RETROACTIVE DATE (CG 00 02 ONLY) |
|---|
| THIS INSURANCE DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" WHICH OCCURS BEFORE THE RETROACTIVE DATE, IF ANY, SHOWN BELOW. |
| RETROACTIVE DATE:  None |
| (ENTER DATE OR "NONE" IF NO RETROACTIVE DATE APPLIES) |

| DESCRIPTION OF BUSINESS |
|---|

FORM OF BUSINESS:
[ ] INDIVIDUAL          [ ] PARTNERSHIP          [ ] JOINT VENTURE

[ ] LIMITED LIABILITY COMPANY    [X] ORGANIZATION, INCLUDING A CORPORATION (BUT NOT INCLUDING A PARTNERSHIP, JOINT VENTURE, OR LIMITED LIABILITY COMPANY)

BUSINESS DESCRIPTION:  **Self Service Station with Mini-Mart**

| ALL PREMISES YOU OWN, RENT, OR OCCUPY |
|---|
| LOCATION NUMBER          ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |

| See Location Schedule 'A' |
| Attached Here Within |

COMMERCIAL GENERAL LIABILITY DECLARATIONS (Continued)    POLICY NUMBER:  TSG0000058-00

| LOCATION NUMBER | CLASSIFICATION | CODE NUMBER | PREMIUM BASE | RATE | | ADVANCE PREMIUM | |
|---|---|---|---|---|---|---|---|
| | | | | Prem/Ops | Prod/Comp Ops | Prem/Ops | Prod/Comp Ops |
| | See Location Schedule 'A' and Premium Schedule Attached Here Within | | | $ | $ | $ | $ |

**CLASSIFICATION AND PREMIUM**

PREMIUM SHOWN IS PAYABLE

STATE TAX OR OTHER (if applicable)    $ _____
TOTAL PREMIUM (Subject to Audit)    $  39,222
AT INCEPTION    $ _____
AT EACH ANNIVERSARY    $ _____
(IF POLICY PERIOD IS MORE THAN ONE YEAR AND PREMIUM IS PAID IN ANNUAL INSTALLMENTS)

**FORMS AND ENDORSEMENTS APPLICABLE:**
See Attached Schedule of Policy Forms and Endorsements.

**THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) COMPLETE THE ABOVE NUMBERED POLICY.**

| Countersigned:    January 14, 2005 | By: |
|---|---|
| Date | Authorized Representative |

IN WITNESS WHEREOF, StarNet Insurance Company designated herein has executed and attested these presents; but this policy shall not be valid unless issued by the Program Administrator hereinbefore mentioned.

Secretary

President

# PREMIUM SCHEDULE

This schedule forms a part of

Policy Number:   TSG0000058-00              of the    StarNet Insurance Company

Issued to:   Palm Springs Oil Company, Inc

Palm Springs Oil Company

| Classification | Code No. | State | Premium Basis | Rate Pr/CO | Rate All Other | Advance Premium Pr/CO | Advance Premium All Other |
|---|---|---|---|---|---|---|---|
| Automotive Repair | 10073 | CA | 30,000 | 32.57 | 12.93 | $977.00 | $388.00 |
| Car Wash - Other than Self Service | 10367 | CA | 102,800 | 0.00 | 20.69 | $0.00 | $2,127.00 |
| Gasoline Stations - self serve | 13454 | CA | 6,450,000 | 0.19 | 4.95 | $1,251.00 | $31,921.00 |
| Grocery Store -NOC | 13673 | CA | 500,000 | 0.34 | 2.70 | $171.00 | $1,351.00 |
| Package Stores and other retail establishment selling alcoholic beverages for consumption off premises (Liquor Liability) | 59211 | CA | 256,000 | 0.00 | 1.57 | $0.00 | $402.00 |
| Buildings or Premises - office - premises occupied by insured | 61224 | CA | 2,000 | 0.00 | 151.00 | $0.00 | $302.00 |

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

© ISO Properties, Inc., 2000

**EXHIBIT 9**

*Palm Springs Oil Company Inc.*

**Premium Summary**

| Coverage | Quoted Premium |
|---|---|
| General Liability and Property | $43,138 |
| Commercial Auto | $9,657 |
| Excess Liability | $12,468 |
| TRIA for Excess Liability | $623 |
| | |
| Sub-Total | $65,886 |
| Surplus Lines Tax (3.225%) | $422.18 |
| Broker Fee | $500 |
| Grand Total | $66,808.18 |

GL will not be subject to audit

Sign here to indicate your acceptance of the
insurance quotation as outlined above*:

Date of Acceptance*:                    1/4/06

Agent's signature and date:

We agree to the terms, limits, conditions, exclusions and premium as quoted within this insurance
proposal. We understand we are responsible to update Thorson Insurance Services during the policy for
any changes in our operation, locations, or any other applicable matter in which insurance may be
affected.
We have read and agreed to the comments and conditions section of this proposal.
We understand that if we would like higher limits for any of the coverage's, we can request this now or
during the policy term and TIS will approach insurance carriers and respond in writing.

12/16/2005

## Thorson Insurance Services

*i thorson*

**EXHIBIT 10**



**A Berkley Insurance Company**
475 Steamboat Road, Greenwich, CT 06830 (203) 542-3800

| Program Administrator: |
| --- |
| Thorson Insurance Services |
| 30699 Russell Ranch Rd., Suite 200 |
| Westlake Village, CA 91362 |



# COMMERCIAL GENERAL LIABILITY DECLARATIONS

POLICY NUMBER:  TSG0000037-00                              PRIOR POLICY NUMBER:

NAMED INSURED:   **Winall Oil Company, Inc., dba: Winall Oil Company**
MAILING ADDRESS:  **1338 East 29th Street**
                 **Signall Hill,  CA 90806**

POLICY PERIOD:    FROM ____**12/1/2004**____  TO ____**12/1/2005**____
                 At 12:01 A.M. at your mailing address shown above

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| LIMITS OF INSURANCE | | |
| --- | --- | --- |
| EACH OCCURRENCE LIMIT | $ **1,000,000** | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $ **100,000** | Any one premises |
| MEDICAL EXPENSE LIMIT | $ **Excluded** | Any one person |
| PERSONAL & ADVERTISING INJURY LIMIT | $ **1,000,000** | Any one person or organization |
| GENERAL AGGREGATE LIMIT | $ **2,000,000** | |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $ **2,000,000** | |

| RETROACTIVE DATE (CG 00 02 ONLY) |
| --- |
| THIS INSURANCE DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" WHICH OCCURS BEFORE THE RETROACTIVE DATE, IF ANY, SHOWN BELOW. |

RETROACTIVE DATE:  ____None____
                  (ENTER DATE OR "NONE" IF NO RETROACTIVE DATE APPLIES)

| DESCRIPTION OF BUSINESS |
| --- |

FORM OF BUSINESS:

[ ] INDIVIDUAL          [ ] PARTNERSHIP          [ ] JOINT VENTURE

[ ] LIMITED LIABILITY COMPANY    [X] ORGANIZATION, INCLUDING A CORPORATION (BUT NOT INCLUDING A PARTNERSHIP, JOINT VENTURE, OR LIMITED LIABILITY COMPANY)

BUSINESS DESCRIPTION:  **Self Service Station with Mini-Mart**

| ALL PREMISES YOU OWN, RENT, OR OCCUPY |
| --- |
| LOCATION NUMBER          ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |

| See Location Schedule 'A' |
| --- |
| Attached Here Within |

CG DS 77 00 01 04      © 2000 Includes Material Copyrighted by ISO Properties, Inc. with permission      Page 1 of 2

COMMERCIAL GENERAL LIABILITY DECLARATIONS (Continued)    POLICY NUMBER:    TSG0000037-00

| | CLASSIFICATION AND PREMIUM | | | | | | |
|---|---|---|---|---|---|---|---|
| LOCATION NUMBER | CLASSIFICATION | CODE NUMBER | PREMIUM BASE | RATE | | ADVANCE PREMIUM | |
| | | | | Prem/Ops | Prod/Comp Ops | Prem/Ops | Prod/Comp Ops |
| | See Location Schedule 'A' and Premium Schedule Attached Here Within | | | $ | $ | $ | $ |

| PREMIUM SHOWN IS PAYABLE | STATE TAX OR OTHER (if applicable) $ |
|---|---|
| | TOTAL PREMIUM (Subject to Audit) $ 50,052 |
| | AT INCEPTION $ |
| | AT EACH ANNIVERSARY $ |
| | (IF POLICY PERIOD IS MORE THAN ONE YEAR AND PREMIUM IS PAID IN ANNUAL INSTALLMENTS) |

**FORMS AND ENDORSEMENTS APPLICABLE:**
See Attached Schedule of Policy Forms and Endorsements.

**THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) COMPLETE THE ABOVE NUMBERED POLICY.**

| Countersigned:    January 21, 2005 | By: |
|---|---|
| Date | Authorized Representative |

IN WITNESS WHEREOF, StarNet Insurance Company designated herein has executed and attested these presents; but this policy shall not be valid unless issued by the Program Administrator hereinbefore mentioned.

_____
Secretary

_____
President

# PREMIUM SCHEDULE

This schedule forms a part of

Policy Number:  TSG0000037-00              of the     StarNet Insurance Company

Issued to:    Winall Oil Company, Inc.
              Winall Oil Company

| Classification | Code No. | State | Premium Basis | Rate Pr/CO | Rate All Other | Advance Premium Pr/CO | Advance Premium All Other |
|---|---|---|---|---|---|---|---|
| Car Washes - Self Service | 10368 | CA | 152,000 | 0.00 | 21.18 | $0.00 | $3,220.00 |
| Gasoline Stations - self serve | 13454 | CA | 11,720,000 | 0.15 | 2.80 | $1,723.00 | $32,781.00 |
| Grocery Store -NOC | 13673 | CA | 4,065,000 | 0.26 | 2.32 | $1,053.00 | $9,443.00 |

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

   © ISO Properties, Inc., 2000   CG 00 01 10 01   ☐

**EXHIBIT 11**



# THORSON & ASSOCIATES
INSURANCE SERVICES AND RISK MANAGEMENT
*A California Corporation*

Westlake North Business Park
30699 Russell Ranch Road
Suite No. 200
Westlake Village, CA 91362
(818) 889-7240
Fax (818) 889-2580

October 15, 2004

**Winall Oil Company**
**Allen Gimenez**
1338 East 29th Street
Signal Hill, CA 90806

Subject:        Station Package
Policy#         TAP50025-03
Expiration      12/01/2004

Dear Mr. Gimenez,

Per our phone conversation, please do not be alarmed by the non renewal you received on the above captioned policy. Thorson Insurance Services has replaced the Petroleum Dealers Program with a new carrier and we look forward to working with you on your upcoming renewal.

As discussed the new program carrier(s) are in part of the WR Berkley Family of Companies (Starnet & Gemini Insurance), and hold an AM Best rating of A+. We are confident you will be pleased with the carrier transition. We are pleased that Berkeley has been secured take over the Clarendon National program. We will be offering you a quality Package Quotation for your General Liability, Commercial Property and Business Auto including non auditable policies and excellent claim handling.

I will pass on your message that you are obtaining quotations from other competitive programs. We realize these products will be offering you a BOP type policy and we look forward to presenting you with quotations that will be competitive.

Enclosed please find your loss runs currently valued for the period of 2000 – 2004.

Thank you for being a valued client since 1999 in our Petroleum Dealers Program! We appreciate your business and look forward to continued service of your insurance needs.

Warmest Regards,

Maria Sanchez
Account Manager

Cc: Vince Polimeni

A Division of
Thorson & Associates
Insurance Services, Inc
License No. OB60850